**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re:

CIT GROUP INC.,

        Reorganized Debtor.

Chapter 11

Case No. 09-16565 (ALG)

------------------------------------------------------------------x
CIT GROUP INC.,

        Plaintiff,

 -against-

TYCO INTERNATIONAL LTD.,

        Defendant.
------------------------------------------------------------------x

Adv. Pro. No. 11-02267 (ALG)

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

SIDLEY AUSTIN LLP
*Attorneys for Plaintiff*
 By: Lee S. Attanasio, Esq.
   John G. Hutchinson, Esq.
   John J. Kuster, Esq.
   Nicholas K. Lagemann, Esq.
787 Seventh Avenue
New York, New York 10019

GIBSON, DUNN & CRUTCHER LLP
*Attorneys for Defendant*
 By: Marshall R. King, Esq.
   Janet M. Weiss, Esq.
   Oliver M. Olanoff, Esq.
200 Park Avenue
New York, New York 10166

**ALLAN L. GROPPER
UNITED STATES BANKRUPTCY JUDGE**

**Introduction**

Before the Court are cross-motions for summary judgment filed, respectively, by the reorganized debtor, CIT Group Inc. ("CIT" or "Reorganized Debtor"), and by its former indirect parent company, Tyco International Ltd. ("Tyco"). CIT argues that a claim filed by Tyco should be subordinated pursuant to § 510(b) of the Bankruptcy Code as one for damages arising from the sale of CIT's securities because the tax agreement on which it is based (the "Tax Agreement") was entered into as an integral part of the spinoff of CIT from Tyco's corporate group in 2002. Tyco asserts in its cross-motion that its claim is for damages for breach of contract and that subordination is not appropriate in view of the purpose and intent of the statute. For the reasons set forth below, CIT's motion is denied, and Tyco's cross-motion is granted.

**Facts**

**A. Background**

CIT filed a petition for relief and a prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code (the "Plan") on November 1, 2009 [Case No. 09-16565 (ALG), Dkt. Nos. 1, 19]. The Court validated the vote of CIT's impaired classes of creditors and confirmed the Plan on December 8, 2009 [Dkt. No. 193]. The Plan provided for the conversion to equity or reinstatement of seven classes of debt issued primarily in the form of notes and debentures; one class of unsecured notes was exchanged for new debt. General unsecured creditors, including holders of claims arising from the rejection of executory contracts, were paid in full and deemed unimpaired. On the other hand, holders of preferred and common stock, as well as subordinated claims, received no recovery.[1]

---

[1] A portion of the preferred stock represented a $2.3 billion U.S. Government investment in CIT through the Troubled Asset Relief Program (TARP).

2

Pursuant to § 365 of the Bankruptcy Code, CIT rejected the Tax Agreement [Dkt. No. 193, ¶ 24]. On January 7, 2010, Tyco filed a proof of claim (the "Tyco Claim") for damages resulting from the rejection. On June 7, 2011, after an agreed standstill period, Tyco invoked an arbitration clause in the Tax Agreement and demanded that damages be determined by an arbitral panel. CIT responded on June 21, 2011 by commencing this adversary proceeding, moving for a temporary restraining order to halt the arbitration and seeking to subordinate the Tyco Claim [Adv. Pro. No. 11-02267 (ALG), Dkt. Nos. 1, 2]. Thereafter, the parties agreed to stay any arbitration proceedings relating to the question of damages, as well as any issues of arbitrability, pending a determination of the question of subordination under § 510(b), as there is no dispute that Tyco will not be entitled to any recovery if the claim is subordinated [Adv. Pro. No. 11-02267 (ALG), Dkt. No. 14].

**B. Undisputed Facts**

As indicated above, this controversy arises in connection with Tyco's former ownership of CIT. On June 1, 2001, a wholly-owned Tyco subsidiary ultimately known as Tyco Capital Holding, Inc. ("TCH") acquired all of the common stock of the predecessor of CIT, then a Nevada corporation ("CIT Nevada"). *CIT SOF* ¶ 3.[2] TCH, also a Nevada corporation, operated solely as a holding company for CIT Nevada. *Tyco SOF* ¶ 3. During TCH's ownership of CIT Nevada, and as a consequence thereof, TCH accrued net operating losses and other federal tax attributes totaling approximately $794 million (the "TCH NOLs"). *Id.* ¶ 14.

On April 25, 2002, Tyco announced that it intended to divest itself of its equity in CIT Nevada as part of a corporate restructuring. *Id.* ¶ 2, 4. This was effected in three steps: (i) a merger of CIT Nevada and TCH on July 2, 2002 (the "Upstream Merger"); (ii) a merger of this

---

[2] References are to the CIT and Tyco Statements of Undisputed Facts, respectively. The facts relied on herein are substantially uncontested by the opposing party.

combined entity with a Delaware corporation (the "Delaware Merger" and, with the Upstream Merger, the "Mergers"), creating "new CIT," which survived and succeeded to all the assets and liabilities of both CIT Nevada and TCH and was reorganized in the Plan as the Reorganized Debtor; and (iii) an initial public offering (the "IPO") of the stock of "new CIT" completed on July 8, 2002. *Id.* ¶ 4-6. After the IPO, Tyco ceased to be a shareholder of CIT, a fact disclosed in the IPO prospectus. *Id.* ¶ 7.

The foregoing transactions were documented in a series of agreements that set forth the rights and obligations of CIT and Tyco, regarding, *inter alia*, indemnification, releases, director and officer liability insurance, and termination of intercompany agreements. The parties' agreements regarding tax matters were governed by the Tax Agreement, which had two principal provisions. *See Declaration of John G. Hutchinson*, Exh. 14 (attaching the Tax Agreement). First, Tyco indemnified CIT for any tax liability incurred during the time CIT Nevada was a member of the Tyco group or as a result of the Mergers. Second, and more important for purposes of these motions, CIT agreed to make a payment to Tyco measured by the benefits it achieved from any pre-spinoff tax attributes that it used thereafter. The latter provision was premised on the understanding that, pursuant to applicable law and as a consequence of the Mergers, CIT would emerge from the restructuring with the ability to apply the NOLs accrued during the years of Tyco's ownership against its own future tax liability. *Tyco SOF* ¶ 5. The Tax Agreement contains a formula providing that CIT would pay Tyco the value of any TCH Tax Benefit it received as a result of utilizing such TCH Tax Attributes, plus interest. "TCH Tax Attribute" was defined to include the TCH NOLs, and "TCH Tax Benefit" was defined as the amount of CIT's reduced tax as a result of the use of a TCH Tax Attribute. The Tax Agreement contains an arbitration clause, and Tyco asserted in its demand for arbitration that CIT was liable

4

for undetermined damages of approximately $90 million in respect of the TCH Tax Benefits that it allegedly used. Tyco also asserted that CIT breached other provisions of the Tax Agreement resulting in additional damages of at least $100 million. *See Hutchinson Declaration*, Exh. 9 (attaching the Notice of Arbitration).

## Discussion

**A.     Legal Standard**

Summary judgment under Rule 56, made applicable by Bankruptcy Rule 7056, is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir. 2005). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A fact is considered material if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The fact that both parties have moved for summary judgment does not establish that there are no material facts in dispute. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *MG Ref. & Mktg., Inc. v. Knight Enters., Inc.*, 25 F. Supp. 2d 175, 180 (S.D.N.Y. 1998). Nevertheless, the Court finds, as the parties have argued, that there are no genuine disputes regarding material facts and, accordingly, the issue presented can be resolved on the existing record.

5

**B.    Subordination under 11 U.S.C. § 510(b)**

The sole issue before the Court is whether the Tyco Claim comes within the ambit of § 510(b) of the Bankruptcy Code, which provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (2006). Neither party argues that the Tyco Claim is one arising directly from fraud in connection with the purchase or sale of a security, or is a claim for rescission or reimbursement or contribution on account of such a claim. On the other hand, neither party disputes that there was a sale of CIT's common stock in connection with the spinoff, that such stock is a "security" as defined in Bankruptcy Code § 101(49), and that the Tax Agreement has some connection with the stock issuance. The issue is whether the Tyco Claim, based on the rejection of a tax agreement executed by an affiliated seller in a corporate restructuring that included a stock issuance, is one for damages "arising from" the sale of a security and is therefore subject to subordination under § 510(b).

**1.  The Construction of § 510(b)**

The leading case and only published decision of the Second Circuit on § 510(b) is *Rombro v. Dufrayne (In re Med Diversified)*, 461 F.3d 251 (2d Cir. 2006). There, the issue was whether a claim for fraudulent inducement and breach of contract for failure to issue common stock in the debtor in exchange for the plaintiff's shares in another company was one "arising from" an agreement to purchase or sell a security. The Circuit Court held that the term "arising from" the purchase or sale of a security could be read broadly, as encompassing the transaction

6

at issue there, or narrowly, as excluding the contract claim of the plaintiff. The Court held that the intent and purpose of the statute would have to be canvassed in order to construe the phrase "arising from" and apply it to the facts of the case. *Id.* at 255.

To examine the intent and purpose of the statute, the Second Circuit began its analysis with the House Report on the 1978 Bankruptcy Reform Act, which cited with approval a 1973 article by John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973) ("Slain & Kripke"). *Id.* at 255-56 (citations omitted). As the *Med Diversified* Court found, Slain and Kripke argued, and Congress agreed when it adopted § 510(b), that claims should be subordinated if the claimant "(1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor." *Id.* at 256. The Court concluded that the claimant in *Med Diversified* took on the "risk and return expectations of a shareholder" because he "bargained not for cash but to become a stockholder in the debtor. … [H]e became bound by the choice he made to trade the relative safety of cash compensation for the upside potential of shareholder status—the very choice highlighted by Slain and Kripke." *Id.* The Circuit Court recognized that the debtor in *Med Diversified* never actually issued any stock to the plaintiff and that potential creditors could not have relied on his investment as an equity cushion, but that "Congress and the courts have clearly elevated the issue of risk [rather than creditor reliance] to the fore." *Id.* at 259 (alteration in original), quoting *In re Enron Corp.*, 361 B.R. 141, 166 n.21 (Bankr. S.D.N.Y. 2006). The Circuit Court ultimately subordinated the plaintiff's contract claim.[3]

---

[3] The only other reported Second Circuit decision construing § 510(b) is its summary order affirming a District Court oral opinion that in turn affirmed a decision of this Court. *See Waltzer v. Nisselson (In re MarketXT*

7

As the Second Circuit noted in *In re Med Diversified*, other Court of Appeals decisions use the same principles to construe §510(b). For example, the Third Circuit, in *Baroda Hill Investments, Inc. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133 (3rd Cir. 2002), subordinated a claim arising from breach of an agreement to use best efforts to register stock because the claimants were "equity investors seeking compensation for a decline in the value of Telegroup's stock…." *Id.* at 142. Even though the claimants apparently never intended to purchase a long-term stake in the debtor, the Third Circuit parsed the legislative history and subordinated the claims because "claimants retained the right to participate in corporate profits if Telegroup succeeded…[and] § 510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors." *Id.* The Court held that "the *policies* underlying § 510(b) require resolving the textual ambiguity in favor of subordinating [the] claims." *Id.* (emphasis added).

CIT relies heavily on *In re Telegroup* for the proposition that a causal connection between the claim and a securities transaction is enough to require subordination. It quotes the statement that "the text of § 510(b) is reasonably read to encompass the claims in this case, since the claims would not have arisen but for the purchase of [the debtor's] stock and allege a breach of a provision of the stock purchase agreement." *Id.* at 138. Even assuming that in this case a breach of the Tax Agreement constituted a breach of the stock purchase agreement, the *Telegroup* Court did not hold that a but-for relationship was sufficient to foreclose textual

---

*Holdings Corp.)*, 346 Fed. App'x 744 (2d Cir. 2009) (summary order), affirming Oral Opinion of Judge Cedarbaum, Case No. 08-cv-05963 (S.D.N.Y. Oct. 30, 2008) (memo endorsed order at ECF No. 11), affirming 2008 Bankr. Lexis 1562 (Bankr. S.D.N.Y. May 22, 2008). The Circuit Court examined both the "plain meaning" of the statute and "the policy rationales cited…in *In re Med Diversified*" in concluding that a securities fraud claim should be subordinated. It expressly found that "either the risk-expectations or equity-pool rationale is sufficient" for a court to require subordination under *In re Med Diversified*. 346 Fed. App'x at 746.

8

ambiguity or require subordination without an examination of the policies underlying the statute. *See id.*

Similarly, the Tenth Circuit, in *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173 (10th Cir. 2002), subordinated a claim for fraud in deceiving a shareholder into holding and not selling his securities because the claimant, "having watched his investment gamble turn sour," was seeking to shift his losses onto creditors. *Id.* at 1180. The Court examined "the statute's purposes and objectives" and determined that "a fraudulent retention claim involves a risk only the investors should shoulder." *Id.*, quoting *In re Granite Partners, L.P.*, 208 B.R. 332, 342 (Bankr. S.D.N.Y. 1997). The Ninth Circuit, in *American Broadcasting Systems, Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir. 2001), likewise subordinated a claim arising from breach of an obligation to deliver stock as part of the consideration under a merger agreement because "investors and creditors have different expectations. Even if an investor never receives her promised shares, she entered into the investment with greater financial expectations than the creditor." *Id.* at 830.

CIT urges that "the Tyco Claim arises directly from the sale of CIT's shares through the IPO because it asserts damages for the purported breach of one of the principal contracts executed in connection with the sale of the shares" and, therefore, comes within the scope of § 510(b). *CIT's Memorandum of Law* 19 ("CIT Memo"). There is no question that the Tax Agreement has a nexus to the issuance of the stock in the IPO in that both were agreed to in connection with the spinoff of CIT from Tyco. As the foregoing cases demonstrate, however, the existence of a mere "connection" between the claim and the purchase or sale of a security is not enough to support a finding that the claim "arises from" the purchase or sale and should be subordinated unless the purposes of the statute would be served thereby. As the Second Circuit

9

held in *In re Med Diversified*, the real question is whether the claimant bargained for the risks and rewards of a holder of equity rather than a holder of debt. Based on the present record, and as further discussed below, it is clear that Tyco contracted for the status of a creditor and not a holder of equity.

CIT also relies on *In re International Wireless Communications Holdings, Inc.*, 257 B.R. 739 (Bankr. D. Del. 2001), to support its theory that the Tax Agreement was so integral a part of the IPO as to be a part of the securities offering itself, thereby bringing the Tyco Claim within the statute. *CIT Memo* 21-22. That case subordinated a claim derived from the breach of a supplement to a share purchase agreement requiring the issuer to conduct an IPO within a certain period of time. *In re International Wireless*, 257 B.R. at 749. The Court held that the fact that the purchase agreement and supplement were "separate documents executed at different times [was] irrelevant." *Id.* at 743. *International Wireless* does not, however, help CIT's argument. The Tax Agreement here was arguably an integral part of the IPO, but it was not, as was the case in *International Wireless*, merely a supplement to a share purchase agreement. In *International Wireless*, "[t]he Supplement was an agreement by [the debtor] to assure [the claimant]…that the [debtor's] stock had a sufficient value," and the Court concluded that the original purchase agreement incorporated the terms of the Supplement, so a breach of one was a breach of the other. *Id.* at 743.

### 2. Equity's Expected Risks and Returns

As did the Second Circuit in *In re Med Diversified*, "we must look outside the text of the statute to determine its intended meaning." 461 F.3d at 255 (citation and quotation marks omitted). The Court held there that the principal policy rationale requires subordination of claims where the claimant contracted for the risks and rewards of an equity investor rather than a

10

creditor. *Id.* at 259. The crucial difference between creditor and investor expectations is that "[t]he creditor can only recoup her investment; the investor expects to participate in firm profits." *In re Betacom*, 240 F.3d at 830, quoted in *In re Med Diversified*, 461 F.3d at 257. The logic for subordinating claims held by investors and not creditors is that of the absolute priority rule, namely that those who enjoy the right to unlimited residual profits from an enterprise should bear the greater risk from insolvency. *In re Telegroup*, 281 F.3d at 139-40. As the Court held in *In re Kaiser Group International, Inc.*, 260 B.R. 684 (Bankr. D. Del. 2001), *aff'd sub nom. Pippen v. Kaiser Group Int'l, Inc. (In re Kaiser Group Int'l, Inc.)*, 2001 U.S. Dist. LEXIS 25574 (D. Del. Nov. 29, 2001), "the most important aspect of [equity] ownership [is] the right to share in any profits of the Debtors or increase in their enterprise value (through appreciation in the value of the stock)." *Id.* at 689. By contrast, "[e]ven if the business prospers, the creditor anticipates no more than the repayment of his fixed debt." *In re Granite Partners*, 208 B.R. at 336, citing Slaine & Kripke, 48 N.Y.U. L. Rev. at 286-87.

On its face, the Tax Agreement provides Tyco with a contractual recovery that is not an unlimited interest in CIT's residual profits. CIT argues that Tyco assumed (or retained) the risk profile of a shareholder in the Tax Agreement because (1) the potential upside to Tyco was undefined and (2) any payments to Tyco were dependent on CIT's future revenues. *CIT Memo* 25-27. As to the first point, Tyco admits that payments from CIT under the Tax Agreement were variable.[4] It is clear, however, that a fixed or variable rate of return and the manner in which payments are measured are not dispositive on the question of the class of risks and rewards assumed by the claimant. For example, in *Racusin v. American Wagering, Inc. (In re American*

---

[4] Tyco calculates that the total return could range from zero to approximately $278 million, assuming a corporate tax rate of 35% and the use by CIT of approximately $794 million of TCH NOLs, with the product of the two being the maximum potential tax benefit to CIT, which would then be payable to Tyco under the Tax Agreement.

11

*Wagering, Inc.)*, 493 F.3d 1067 (9th Cir. 2007), the Ninth Circuit declined to subordinate a claim based on a judgment for compensation owed to the debtor's financial advisor in connection with an IPO. Even though part of the claim was valued based on the debtor's future stock price, the Court concluded that the holder of the claim did not bargain to become a shareholder, stating, "[A]lthough Racusin's compensation was to be *valued* on the basis of the debtors' share price upon completion of the IPO, the contract did not provide for that compensation in the form of shares. His potential to earn greater profits as a shareholder thus did not exist." *Id.* at 1072.

Similarly, in *In re NationsRent, Inc.*, 381 B.R. 83 (Bankr. D. Del. 2008), the debtor had acquired claimant's companies in exchange for stock, cash, promissory notes, and "Make-Whole Amount[s]…based upon the value of the common stock of Debtors on the third anniversary of the acquisition." *Id.* at 86. As to the Make-Whole Amounts, the *NationsRent* Court found § 510(b) inapplicable since the claims based on them were

> not [for] "damages" arising from or caused by fraud, a securities violation or as an obligation which Debtors undertook in connection with the issuance of stock. The Court is persuaded that the Make-Whole Amounts are simply that, namely, claims to recover payment due under agreements of sale of businesses. The Make-Whole Claimants were not investors, nor were they speculating on the success of the Debtors. Instead, the Make-Whole Amounts exist to provide the Seller Claimants with their bargained for sales price. The Make-Whole Amounts are deferred compensation with a formula which serves as a damage buffer.

*Id.* at 92. Again, in *Raven Media Investments, LLC v. DirecTV Latin America, LLC (In re DirecTV Latin Am., LLC)*, 2004 U.S. Dist. LEXIS 2425 (D. Del. Feb. 4, 2004), the Court declined to subordinate a claim arising from a membership interest put agreement where the value of the put was tied to an arbitrary number and not the enterprise value of the debtor. The Court also found it significant that the claimant had no right to participate in management or any other indicia of ownership associated with share ownership. *Id.* at *11. "[T]he transaction's structure clearly show[ed] that Raven did not seek to hold an equity interest [in the debtor]." *Id.*

12

The Tyco Claim is similar to the claims in these cases: it arises from a Tax Agreement that provides for payments in the future based on a variable metric, but it does not include an interest in the firm's future equity value or management. When the Tax Agreement is viewed as a whole, with both the tax indemnification rights for CIT and the TCH NOL reimbursement rights for Tyco, it resembles an exchange as part of a corporate sale with consideration being paid over time and in to-be-determined amounts. Although the amount owed to Tyco under the Tax Agreement was based on CIT's future revenues and thus on financial metrics that might correlate with share price, Tyco could not have expected a return similar to that of shareholders, who as the residual owners of a corporate enterprise are entitled to share in profits *with no limitation*. The expectations of shareholders are not tied to taxable income, a technical concept, but to overall profits generating dividends or causing a rise in share price. Neither the availability of profits for dividends nor an increase in share price would necessarily result in increased payments to Tyco, and it is equally accurate to describe Tyco's rights in the TCH NOLs as a participation in the tax consequences of past losses rather than in future gains.

It is also worth noting that there is nothing inherent in an interaffiliate tax agreement that would justify treating Tyco's interest like equity. In general, tax sharing agreements are enforced in bankruptcy and create contractual debtor-creditor relationships. *See, e.g.*, *Resolution Trust Corp. v. Franklin Savs. Corp. (In re Franklin Savs. Corp.)*, 182 B.R 859 (D. Kan. 1995) (tax agreement language governing reimbursement by parent of tax refunds attributable to subsidiary operations intended to create a receivable); *Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*, 269 B.R. 481 (Bankr. E.D.N.Y. 2001) (debtor-creditor, rather than agency or trust, relationship existed under tax agreement providing that debtor holding company pay subsidiaries to the extent losses attributable to them were utilized in consolidated returns);

13

*Team Fin. Inc. v. FDIC (In re Team Fin., Inc.)*, 2010 Bankr. LEXIS 1493 (Bankr. D. Kan Apr. 27, 2010) (debtor-creditor relationship existed where tax agreement created obligations for (i) debtor parent, which filed consolidated tax returns, to pay tax refunds attributable to non-debtor subsidiaries' NOLs to the subsidiaries, and (ii) subsidiaries to pay debtor their respective tax liabilities). CIT offers no justification for the Court to treat the Tax Agreement differently or as a disguised equity interest.

It is recognized, as CIT argues, that "nothing in § 510(b)'s text requires a subordinated claimant to be a shareholder." *In re Betacom*, 240 F.3d at 829 (citations omitted); *see also In re Med Diversified*, 461 F.3d at 258 (same). However, cases that have held that shareholder status is not necessary for subordination have invariably been grounded on the deprivation of the opportunity to become a shareholder. *See, e.g.*, *In re Med Diversified*, 461 F.3d 251 (subordinating claim arising from failure to issue securities pursuant to severance agreement); *In re Betacom*, 240 F.3d 823 (subordinating claim arising from failure to deliver stock pursuant to merger agreement); *In re PT-1 Commc'ns, Inc.*, 304 B.R. 601 (Bankr. E.D.N.Y. 2004) (subordinating claim based on failure to issue stock). The fact that the Tax Agreement was part of a set of agreements between corporate affiliates on the sell side executed to facilitate the IPO, but that the IPO was the actual sale of the Reorganized Debtor's securities by CIT to third-party purchasers, puts the Tyco Claim outside even a broad reading of the statute. The Court has not uncovered a case of subordination under §510(b) where the purchaser has not sought recovery against the seller, or *vice versa*, or where a third party has not sought recovery under the "reimbursement or contribution" clause. Representative third party § 510(b) cases include *In re Mid-American Waste Systems, Inc.*, 228 B.R. 816 (Bankr. D. Del. 1999), where the Court subordinated indemnification claims filed by (i) the underwriter in the debtor's public securities

14

offering pursuant to contract and (ii) directors and officers pursuant to the debtor's certificate of incorporation and Delaware corporate law; *Official Comm. of Creditors Holding Unsecured Claims v. PaineWebber Inc. (In re De Laurentiis Entm't Grp., Inc.)*, 124 B.R. 305 (C.D. Cal. 1991) (subordinating contractual indemnification asserted by underwriter in defending securities law claims arising out of public offering); and *In re Touch Am. Holdings*, 381 B.R. 95 (Bankr. D. Del. 2008) (subordinating statutory indemnification claim asserted by directors and officers). In the present case, Tyco, the arguable seller of securities, is not suing the buyer, or *vice versa*, and there is no claim for reimbursement or contribution.

CIT cites no authority that subordinates a claim under § 510(b) merely because it was derived from an equity interest that was exchanged for a debt interest in the distant past. In fact, there is substantial authority that a former shareholder can divest itself of a debtor's shares in exchange for a contractual payment obligation without being subject to subordination under §510(b). Courts are concerned with "the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor…and all attempts of that kind should be viewed with suspicion." *Jezarian v. Raichle (In re Stirling Homex Corp.)*, 579 F.2d 206, 213 (2d Cir. 1978), quoting *Newton Nat'l Bank v. Newbegin*, 74 F. 135, 140 (8th Cir. 1896). However, courts have "equal concern for guarding against attempts by a bankruptcy debtor to clothe a general creditor in the garb of a shareholder…." *In re Med Diversified*, 461 F.3d at 258. Accordingly, claims based on promissory notes issued as consideration in stock repurchase agreements have been held to be outside the scope of § 510(b) because the former equity holders in fact took on the role and limited position of a creditor. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Am. Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.)*, 306 B.R. 778, 782 (Bankr. D. Del. 2004) ("The statute was designed to prevent stockholders from reaping the

15

benefit of unlimited profits without also fully accepting the inherent risks of ownership, namely loss of their investment."); *Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward Holding Corp.)*, 272 B.R. 836 (Bankr. D. Del 2001); *In re Wyeth Co.*, 134 B.R. 920 (Bankr. W.D. Mo. 1991). In *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 388-90 (Bankr. S.D.N.Y. 2007), this Court declined to subordinate a claim for a fixed amount pursuant to state court default judgments based on defaulted promissory notes, even though the claim had originated in the claimant's holding of preferred shares and the original consideration for the notes was the liquidation preference of preferred stock. In these cases, the "causal connection" between the purchase or sale of a security was too remote to require subordination of a contract claim when the purpose and intent of the statute was considered.

It is therefore not determinative that the Tax Agreement may have been part of Tyco's effort to recoup losses generated during the time Tyco was the ultimate owner of CIT in the form of the TCH NOLs, or to "monetize" Tyco's equity interest in CIT, as CIT puts it.

### 3. Equity Cushion

The second policy rationale for subordination of claims under §510(b) is to prevent a claimant from recovering as a creditor where it made a "contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor." *In re Med Diversified*, 461 F.3d at 256. As the Court held in *Med Diversified*, this is a less important rationale. *Id.* at 259.

CIT's argument that Tyco made a contribution to the CIT equity pool does not withstand analysis. First, an equity cushion matters most when creditors need to resort to it to satisfy their claims. The TCH NOLs, however, have no value except under the reverse situation, i.e., if CIT is

16

flush with taxable income. Creditors would have little reason to rely on or expect recourse to any asset that would be worthless if the company has no taxable income.

Second, if creditors are to rely on an equity contribution, there must be some investment in the company on which to rely. CIT characterizes Tyco's investment post-IPO by reference to its holdings pre-IPO, essentially arguing that any value derived from an IPO is necessarily a return on investment to a former sole shareholder. However, CIT never identifies Tyco's alleged investment after the IPO in favor of CIT. It is clear that it did not consist of an interest in equity because Tyco ceased to be a shareholder. The closest analogue to a purchase price for the right to TCH NOL reimbursement (the purported return on investment) is Tyco's tax indemnification of CIT for pre-IPO events. This situation is far removed from the classic equity cushion composed of cash paid for common stock, and it is difficult to imagine creditors relying on a capital contribution the defies description.

Based on the foregoing, the equity-cushion rationale justifying subordination of claims arising from securities transactions does not assist CIT.

### Conclusion

For the reasons set forth above, CIT's motion for summary judgment is denied, and Tyco's cross-motion for summary judgment is granted. Tyco's counsel shall settle an order on five days' notice.

Dated: December 21, 2011
      New York, New York

                                              */s/ Allan L. Gropper*
                                            UNITED STATES BANKRUPTCY JUDGE